UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>BREON TYREE BRUNSON and<br>NICKIE HEILDELBURG NIXON,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 22-CR-149 JLS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**<br><br>(ECF No. 49) |

　　　Presently before the Court is Defendant Nickie Heildelburg Nixon's ("Nixon") Motion to Suppress Evidence and Statements ("Mot.," ECF No. 49). Nixon's co-defendant, Breon Tyree Brunson ("Brunson"), moved to join the Motion. *See* ECF No. 51. The Government filed a Response in Opposition ("Opp'n," ECF No. 62) to the Motion. Following an evidentiary hearing, the Parties submitted supplemental briefing on the Motion ("Supp. Mot.," ECF No. 85; "Supp. Opp'n," ECF No. 88). Having considered the Parties' arguments and the law, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

/ / /

/ / /

/ / /

# BACKGROUND

On August 1, 2021, San Diego Police Department Officers Isai Sanchez and Humberto Moreno were performing "proactive enforcement" while parked in an alley west of the 4100 block of Menlo Avenue. ECF No. 49-1 at 4. From their vantage point, the officers could see a gray Hyundai SUV parked in the alley near a known gambling house on the 4000 block of Menlo Avenue. *Id.* The SUV pulled away from the suspected gambling house, drove north through the alley, and then turned east onto Polk Avenue. *Id.* Officers Sanchez and Moreno followed. *Id.*

Inside the SUV were Defendants Nixon and Brunson, as well as a third passenger, Gregory Thomas, who is not a party to this action. *Id.* Brunson was driving, Nixon was in the front passenger seat, and Thomas was in a rear passenger seat. *Id.* After turning onto Polk Avenue, Brunson turned south onto the 4000 block of Menlo Avenue. *Id.* As Brunson approached the southern end of the 4000 block of Menlo Avenue, he turned right without signaling and parked in a private driveway. *Id.*; Mot. at 2.

Officers Sanchez and Moreno had trailed Brunson down the 4000 block of Menlo Avenue. ECF No. 49-1 at 4. Nixon and Brunson claim that they did not notice the marked patrol car behind them, Mot. at 3, but the Government contends that Officers Sanchez and Moreno were behind Brunson when he suddenly slowed down and turned into the driveway, Opp'n at 2. The officers parked directly behind Brunson's SUV and initiated a traffic stop for alleged violations of California Vehicle Code §§ 22107 (unsafe turn) and 22500 (parking in a private driveway). ECF No. 49-1 at 4.

A records check revealed that Thomas was subject to a Fourth Amendment waiver. *Id.* Thomas was handcuffed and placed inside a patrol car. *Id.* at 4–5; Def. Ex. C (ECF No. 49-1) at 14:30–17:00. Pursuant to Thomas's Fourth Amendment waiver, Officer Sanchez began searching the SUV. ECF No. 49-1 at 5; Def. Ex. C at 18:25–19:30. He discovered a handgun in plain view between the center console and the front passenger seat, where Nixon had been sitting. ECF No. 49-1 at 5; Def. Ex. C at 19:35–19:55. The handgun was unserialized and loaded with seven rounds of 9mm ammunition. ECF No.

49-1 at 5.  Nixon and Brunson, both of whom had prior felony convictions, were then handcuffed.  *Id.*; Def. Ex. C at 19:55–20:50.

Nixon, Brunson, and Thomas were transported to San Diego Police Department headquarters for further investigation.  ECF No. 49-1 at 5.  There, police officers performed DNA swabs and other investigative tasks as the three suspects remained handcuffed inside patrol cars.  Mot. at 5; Def. Ex. G (ECF No. 49-1).  Nixon, Brunson, and Thomas were then interviewed by Detective Christopher Tews.  ECF No. 49-1 at 5.  All three denied knowledge of the firearm.  Opp'n at 3.  Later, DNA analysis performed by the San Diego Police Department Crime Laboratory implicated Nixon and Brunson but excluded Thomas.  *Id*.  Nixon and Brunson were ultimately charged with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1.

Defendants now move to suppress any evidence recovered from the search of Brunson's vehicle, arguing that the traffic stop violated Defendants' Fourth Amendment rights because it was not justified by reasonable suspicion of criminal activity.  *See* Mot. at 6–14.  Defendants also contend that certain statements made by Defendant Nixon to the police should be suppressed because they were taken in violation of Nixon's right against self-incrimination under the Fifth Amendment.  *Id.* at 14–22.

## DISCUSSION

### I. Fourth Amendment

The Fourth Amendment prohibits unreasonable searches and seizures by the government.  U.S. CONST. Amend. IV.  "The Fourth Amendment 'applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'"  *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).  "Even a brief traffic stop is a seizure within the meaning of the Fourth Amendment, and therefore is subject[] to the 'constitutional imperative' that it be reasonable under the circumstances."  *United States v. Brooks*, No. CR 17-16-BU-DLC, 2018 WL 297572, at *3 (D. Mont. Jan. 4, 2018) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)), *aff'd*, 772 F. App'x 573 (9th Cir. 2019).

"In order to satisfy the Fourth Amendment's strictures, an investigatory stop by the police may be made only if the officer in question has 'a reasonable suspicion supported by articulable facts that criminal activity may be afoot[.]'" *Montero-Camargo*, 208 F.3d at 1129 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "A traffic violation alone is sufficient to establish reasonable suspicion." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).

"The [reasonable suspicion] standard takes into account the totality of the circumstances—the whole picture. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotations and citations omitted). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Montero-Camargo*, 208 F.3d at 1129 (emphasis in original). The particularized suspicion requirement, in turn, has two elements: the assessment must be based upon the totality of the circumstances, and the assessment "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Id.*

"[T]he government has the burden to produce specific and articulable facts to support a suspicion of illegal activity justifying an investigatory stop," *United States v. Waldeck*, No. CR 22-59-M-DWM, 2023 WL 2643495, at *4 (D. Mont. Mar. 27, 2023) (internal quotations omitted), but the "defendant has the burden of proof on a motion to suppress evidence," *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005). "Accordingly, once the government has presented specific and articulable facts to justify a search or seizure, a defendant must refute any evidence or testimony presented by the government in order to cast doubt on the validity of that search or seizure." *Waldeck*, 2023 WL 2643495, at *4 (internal quotations omitted).

///

Defendants argue that Officers Sanchez and Moreno did not have reasonable suspicion to perform the stop because California law did not require Brunson to signal prior to turning into the private driveway. Supp. Mot. at 2–9. Consequently, there was no traffic violation that justified the stop. Likewise, in Defendants' view, Sanchez and Moreno lacked reasonable suspicion to stop Defendants for parking on private property, as the officers did not know whether Brunson was the owner of the property on which he parked, nor his purpose for parking. *Id.* at 9–10. Finally, Defendants argue that Sanchez's search of the front of Brunson's vehicle exceeded the scope of a permissible probation search, and that the search and seizure was arbitrary, capricious, and harassing. *See id.* at 10–13.

According to the Government, Defendants' Fourth Amendment rights were not violated because Officers Sanchez and Moreno "clearly had a reasonable suspicion of criminal activity where Defendant [Brunson] made an abrupt and sudden turn without appropriately signaling." Opp'n at 6 (emphasis omitted). Moreover, "[t]he officers also had an independent valid basis for the traffic stop because Brunson parked illegally after suddenly turning." *Id.* (emphasis omitted). Finally, the Government argues that the search was neither excessive in scope nor pretextual. Opp'n at 11–12.

Here, the Court finds that the Government has met its burden of showing that there was reasonable suspicion to stop Defendants for illegally making a turn without signaling. California Vehicle Code § 22107 provides that "[n]o person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal . . . in the event any other vehicle may be affected by the movement." In other words, if a turn could affect another vehicle, California law requires that the driver making the turn use a turn signal.

Officers Sanchez and Moreno testified that as they approached Brunson's vehicle, ECF No. 82 at 71, Brunson "slowed down drastically," *id.*, causing the officers themselves to "come to a slow roll and stop completely behind the vehicle," *id.* at 22. Consequently, Brunson's reduction in speed and subsequent turn "affected" the officers such that Brunson was required to use a turn signal pursuant to California Vehicle Code § 22107. It is

undisputed that Brunson did not signal prior to turning into the driveway.  *See* Mot.; Supp. Mot.  Because Brunson did not use a turn signal, the officers had a reasonable suspicion of criminal activity—the illegal turn—to perform the stop.  *Willis*, 431 F.3d at 714 (traffic stop permissible where police have "at least reasonable suspicion" of a traffic violation).

As the Government has met its burden of producing facts supporting reasonable suspicion of illegal activity, Defendants must meet their burden of refuting this evidence to cast doubt on the existence of reasonable suspicion.  *See Waldeck*, 2023 WL 2643495, at *4.  Defendants have failed to do so.  Defendants present no evidence refuting or otherwise casting doubt on Officers Sanchez and Moreno's testimony.  Instead, Defendants merely argue that they did not see the officers behind them on Menlo Avenue.  Mot. at 3, 8; Declaration of Nickie Heidelburg Nixon ("Nixon Decl.," Def. Ex. D, ECF No. 49-1) ¶ 15.  This contention, however, offers no challenge to Officers Sanchez and Moreno's version of events.

Defendants present a private investigator's reenactment of the stop that allegedly demonstrates that the officers were not close enough to Defendants' vehicle to be affected by the stop.  *See* Supp. Mot. at 7–9.  But Defendants' reenactment fails to account for numerous factors that could have affected the distance between the vehicles at the time Brunson turned into the private driveway.  For example, Defendants provide no evidence as to (1) the speed at which Defendants were traveling, (2) the speed at which the officers were traveling, (3) the amount of time Defendants were stationary at the stop sign at the intersection of Polk and Menlo Avenues, or (4) the rate at which Brunson decelerated to make the turn.  Indeed, the only relevant facts accounted for by the reenactment are that the officers departed roughly 30 seconds after Brunson turned right onto Polk Avenue and that the officers did not stop at the stop sign at Polk and Menlo Avenues.  *See id*.  The reenactment presents one possible outcome among many.  Without accounting for the variety of factors that could have affected the distances between the two vehicles, the reenactment fails to refute Officers Sanchez and Moreno's testimony.

/ / /

Finally, at the evidentiary hearing, Officer Moreno testified that when Brunson's vehicle slowed down prior to turning into the driveway, "that's what allowed [the officers] to catch up to the vehicle." ECF No. 82 at 11. Defendants contend that this testimony "proves that the officers were not close enough to Mr. Brunson's car to require a signal." Supp. Mot. at 6. This conclusion, however, does not follow from Officer Moreno's testimony. The fact that the officers were not immediately affected by Brunson's reduction in speed does not imply that the officers could not have been affected by Brunson's turn.

Defendants interpret California Vehicle Code § 22107 to require a signal only when a turning vehicle actually and immediately affects another vehicle behind it. But § 22107's dictates are not so narrow; signals are required whenever "any other vehicle *may* be affected by the movement." Cal. Vehicle Code § 22107 (emphasis added); *see also People v. Logsdon*, 79 Cal. Rptr. 3d 379, 382 (Ct. App. 2008) ("Actual impact is not required by [California Vehicle Code § 22107]; potential effect triggers the signal requirement."). Whether a vehicle's turn *could* affect another depends not only upon the distances between the vehicles, but also upon the relative speed of the vehicles, the sharpness of the turn, the rate of the turning vehicle's deceleration, and a variety of other factors. Defendants' argument focuses exclusively on the distance between the two vehicles at the moment Brunson reduced his speed to turn into the driveway (which they fail to prove with any certainty), ignoring other relevant considerations.

In sum, the Government has met its burden of showing that Brunson's turn affected their vehicle, giving rise to reasonable suspicion of criminal activity justifying the stop. Defendants have failed to rebut this evidence. Given this conclusion, the Court need not determine whether reasonable suspicion existed to stop Defendants for illegally parking on private property, and Defendants' argument that the stop was pretextual is necessarily defeated.

Defendants remaining argument, raised for the first time in their supplemental briefing, is that the officers exceeded the permissible scope of the search of the vehicle made pursuant to Thomas's probationary conditions. Supp. Mot. at 10–11. Defendants

note that "[t]he officers themselves acknowledged that the scope of their probation search was limited to the area that Mr. Thomas had access to." *Id.* at 11. Thomas, who was sitting in a rear passenger seat, easily could have accessed the area of Brunson's vehicle between the center console and the front passenger seat, where the gun was found. Accordingly, it is unclear to the Court how the officers' search of that area of the vehicle could have exceeded the permissible scope of the probationary search. Defendants cite to no authority to the contrary.

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Suppress to the extent that it seeks to suppress the evidence found in Brunson's vehicle.

## II.     Fifth Amendment

### A.     Nixon's Statements to Officers Sanchez and Moreno

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established that "[t]he Constitution requires that a person be advised of certain rights if they are 'in custody' and 'subjected to interrogation.'" *United States v. Carroll*, 102 F. Supp. 3d 1134, 1136 (N.D. Cal. 2015) (quoting *Miranda*, 384 U.S. at 467–68). Specifically, prior to custodial interrogation, a person must be advised that they have the right to remain silent, that statements made can be used against them, that they have the right to counsel, and that they have the right to have counsel appointed. *See Miranda*, 384 U.S. at 444; *Campos v. Horel*, No. C-08-03750 RMW, 2012 WL 1376982, at *3 (N.D. Cal. Apr. 19, 2012). "The government's failure to provide such advisements renders statements made by a person during a custodial interrogation inadmissible." *Carroll*, 102 F. Supp. 3d at 1136. "The Supreme Court has not required a 'precise formulation of the warnings given' to a suspect and has stressed that a 'talismanic incantation' is not necessary to satisfy *Miranda*'s 'strictures.'" *United States v. Loucious*, 847 F.3d 1146, 1149 (9th Cir. 2017) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)). "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quoting *Prysock*, 453 U.S. at 361)).

Under *Miranda*, a suspect is "in custody" if they have been "deprived of [their] freedom of action in any significant way." 384 U.S. at 444. "To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "We then ask whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 1082 (quoting *Thompson*, 516 U.S. at 112). Accordingly, "[i]f, considering the totality of the circumstances, a reasonable person would not feel free to leave the interrogation, then the interrogation was custodial." *Carroll*, 102 F. Supp. 3d at 1136. "Generally, a reasonable person would not feel free to leave if 'something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *Id.* (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)).

"For police statements to be considered 'interrogation,' they 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted); *see also United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981) ("[W]e emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response."). "The test is an objective one; the subjective intent of the police is relevant, but not conclusive." *Washington*, 462 F.3d at 1132. "The relationship of the question asked to the crime suspected is highly relevant."
///

*United States v. Gonzalez-Mares*, 752 F.2d 1485, 1489 (9th Cir. 1985). "Voluntary statements are not considered the product of interrogation." *Washington*, 462 F.3d at 1132.

Defendants argue that all statements made by Nixon to Officer Sanchez should be suppressed, "as they were taken in violation of Mr. Nixon's rights against self-incrimination under the Fifth Amendment and *Miranda*." Supp. Mot. at 14. Defendants argue that prior to providing Defendants with a *Miranda* warning, Officer Sanchez asked Nixon several questions that were likely to elicit an incriminating response at a time when Nixon was not free to leave. *Id.* The Government, on the other hand, contends that Officer Sanchez's statements did not constitute interrogation, nor was Nixon in custody at the time. Opp'n at 14. Accordingly, a *Miranda* warning was not necessary, and Nixon's statements should not be suppressed, in the Government's view. *Id.*

Here, the Court agrees with Defendants. First, Defendant Nixon was clearly in custody when Officer Sanchez proposed the questions at issue. Shortly after Officer Sanchez located the firearm in Brunson's vehicle, Brunson and Nixon were placed in handcuffs. Def. Ex. C at 19:40–20:50. While Officer Sanchez initially stated that the handcuffs were for his own safety, he did not tell Defendants that they only would be restrained temporarily, or that they were free to leave. Rather, Officer Sanchez told Nixon to sit on the patrol vehicle and then started questioning Nixon about the firearm. *Id.* at 20:40–45, 21:05–21:30. Under such circumstances, a reasonable person would not have felt at liberty to terminate the interrogation and leave. *See United States v. Roberts*, 430 F. Supp. 3d 693, 702 (D. Nev. 2019) ("Defendant was in custody upon being placed in handcuffs by [officers] as it became apparent that Defendant was not free to leave at that moment."); *U.S.A. v. Magdirila*, No. 2:17-CR-00729-CAS-1, 2018 WL 1472498, at *11 (C.D. Cal. Mar. 22, 2018) (finding defendant was in custody for Fourth Amendment purposes given "multiple police vehicles present at the scene, the use of handcuffs, and [officer's] questioning of defendant during his inventory search of the vehicle"), *aff'd sub nom. United States v. Magdirila*, 962 F.3d 1152 (9th Cir. 2020). Officer Sanchez confirmed as much when, immediately after questioning Nixon about the firearm, he

informed Defendants that they were being detained in light of the discovery, Ex. C. at 21:30–21:35, and stated that "none of you are free to leave," *id.* at 21:45–21:55.

Second, Officer Sanchez's questions and statements were reasonably likely to elicit an incriminating response from Nixon. After handcuffing Nixon, Sanchez asked Nixon, "You know why you're in handcuffs, right?" and then confronted him with incriminating evidence, stating "There's a gun in the front, just in plain view, why is there a gun there?" Ex. C at 21:10–21:20. Sanchez continued, "There's a gun right there, man. It's right there, right where you were. So, I don't know if someone dumped it on the front or something, but somebody needs to tell me something." *Id.* at 21:20–21:28. After informing Defendants that they were not free to leave, Sanchez asked Nixon, "Why didn't you tell us there was a gun right there?" *Id.* at 22:10–22:20. While Sanchez's questions appear to be the product of his surprise upon discovering the firearm, Sanchez's subjective intent is not determinative. *Washington*, 462 F.3d at 1132. The Court must objectively assess Sanchez's statements to determine whether they were reasonably likely to elicit an incriminating response. Given the strong relationship between the crime suspected (being a felon in possession of a firearm) and questions asked ("[W]hy is there a gun there?"), as well as the accusatory tone of Sanchez's statements ("It's right there, right where you were. . . . Why didn't you tell us there was a gun right there?"), the Court concludes that Sanchez's dialogue with Nixon was reasonably likely to elicit an incriminating response from Nixon. *See United States v. Gomez*, 772 F. Supp. 2d 1185, 1191 (C.D. Cal. 2011) (finding officer's statement to defendant, "I saw you throw that," which informed defendant that the officer had seen defendant throw a bag of drugs out of a car window, constituted interrogation); *United States v. Hayes*, No. 13-CR-00085-JD-1, 2014 WL 5408425, at *4 (N.D. Cal. Oct. 22, 2014) ("Asking [defendant] if the clothes in the trunk belonged to him—clothes found in the same bag as drugs and a gun—was reasonably likely to elicit an incriminating response.").

/ / /

/ / /

Consequently, Officer Sanchez's questioning of Nixon constituted custodial interrogation, which must have been preceded by a *Miranda* warning. As Sanchez did not provide the requisite warning, Nixon's statements to Sanchez must be suppressed. Therefore, the Court **GRANTS** Defendants' Motion to Suppress as to the statements that Nixon made to Sanchez at the scene of the traffic stop.

### B.   *Nixon's Statements to Detective Tews*

Defendants next argue that Nixon's statements to Detective Tews should be suppressed "on several grounds." Supp. Mot. at 15. First, according to Defendants, Detective Tews "engaged in a two-step interrogation that prevented the eventual warning from functioning effectively as required by *Miranda*." *Id.* Next, Defendants contend "Mr. Nixon did not knowingly and voluntarily waive his *Miranda* rights." *Id.* Finally, "Mr. Nixon's statements were not voluntary," in Defendants' view. *Id.* Specifically, Defendants argue that police coerced Nixon's statement by "ke[eping] Mr. Nixon inside a hot car in the garage for a prolonged period of time" and failing to respond to his complaints about the heat and his thirst. Mot. at 19, 21–22. The Government counters that Nixon was adequately informed of his *Miranda* rights, made a knowing and intelligent waiver of said rights, and that his statements were voluntary. Opp'n at 16–24.

#### 1.   Two-Step

Under the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), "a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning was objectively ineffective." *United States v. Williams*, 435 F.3d 1148, 1150 (9th Cir. 2006). However, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985). The Supreme Court explained that:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the

> investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

Here, Detective Tews' interrogation of Nixon was not part of a deliberate two-step interrogation process such that *Seibert* would demand suppression. Defendants have failed to adduce any evidence showing that Officer Sanchez and Detective Tews's interrogations of Nixon were part of a coordinated, deliberate effort to solicit incriminating statements from Nixon in violation of his Fifth Amendment rights. *See Missouri v. Seibert*, 542 U.S. at 616 (finding Fifth Amendment violation where facts showed "police strategy adapted to undermine the *Miranda* warnings"); *Williams*, 435 F.3d at 1157 (noting that Justice Kennedy's opinion in *Seibert* "narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda*'s protections"). Rather, the body-camera footage of the traffic stop tends to show that Officer Sanchez's statements to Nixon were a spontaneous response to the discovery of the firearm in Brunson's vehicle. Def. Ex. C at 19:40–24:00. Moreover, while Officer Sanchez's statements were made in violation of *Miranda*, as discussed above, Nixon's responses were not the product of coercion. The officers' body camera footage demonstrates that no physical or psychological coercion preceded Nixon's statements to Sanchez. *Id.* Therefore, Sanchez's unwarned statements to Nixon did not contaminate the investigatory process such that that Nixon's subsequent waiver of *Miranda* was necessarily ineffective. *See Elstad*, 470 U.S. at 318.

Consequently, the Court **DENIES** Defendant's Motion to Suppress as to the claim that Nixon's statements were the product of an impermissible two-step interrogation.

/ / /

/ / /

### 2. Knowing and Voluntary Waiver

"For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998). "'Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant.'" *United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993) (quoting *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986)). A waiver of *Miranda* rights may be either express or implied. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

"There is a presumption against waiver, of which the Government bears the burden of overcoming by a preponderance of the evidence." *United States v. Crews*, 502 F.3d 1130, 1139–40 (9th Cir. 2007). Generally, "the Government must prove that, under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment." *Id.* at 1140. Relevant factors include the following:

> (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*Id.*

Here, the Court finds that Nixon knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to interrogation by Detective Tews. After asking Nixon a series of routine booking questions, Detective Tews stated that he needed to inform Nixon of his rights prior to any further questioning. Def. Ex. H at 3:00–3:06. Detective Tews then proceeded to advise Nixon of each of his *Miranda* rights. *Id.* at 3:06–3:50. After explaining each *Miranda* right, Detective Tews asked Nixon if he understood. *Id.* Nixon / / /

answered in the affirmative as to every *Miranda* right. *Id.* Only after this process did Detective Tews interrogate Nixon about the firearm. *Id.* at 3:50–10:40.

Defendants take issue with Detective Tews' failure to ask Nixon if he wanted to waive his rights. Supp. Mot. at 16. A suspect may, however, waive their *Miranda* rights explicitly or implicitly, *see Thompkins*, 560 U.S. at 384; there is no requirement that police acquire an explicit waiver before interrogating a suspect, *id* at 383–84 (noting the "main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel"). Defendants also contend that Detective Tews (1) failed to ask Nixon if he wanted to answer questions without a lawyer, (2) failed to tell him that he could stop questioning at any time, and (3) "behaved as though the waiver was a foregone conclusion." Supp. Mot. at 16–17. Defendants point to no authority holding that such warnings are required for a valid waiver, *see id.*, and Defendants' characterization of Detective Tews' advisements is inaccurate. Detective Tews effectively communicated each of Nixon's rights and confirmed Nixon's understanding of each right prior to interrogation. Def. Ex. H at 3:06–3:50. The rights were communicated to him in his native tongue, *id.*, and Nixon, a convicted felon, had prior experience with the criminal justice system, *see* Opp'n at 6. Additionally, Defendants have presented no evidence showing Nixon was mentally incapable of waiving his rights. Taken together, these facts demonstrate that Detective Tews reasonably conveyed to Nixon his rights as required by *Miranda*. *Crews*, 502 F.3d at 1139–40; *Duckworth*, 492 U.S. at 203.

Accordingly, the Court **DENIES** Defendants' Motion to Suppress as to the argument that Nixon's waiver of his *Miranda* rights was not knowing, voluntary, or intelligent.

3. *Involuntary Statements*

A suspect's statement is made involuntarily if the suspect was "coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003); *see also United States v. Moran-Can*, No. R2201661001TUCSHRLCK, 2023 WL 2727824, at *5 (D. Ariz. Mar. 31, 2023) ("The test for determining the voluntariness of a suspect's confession is whether, considering all the

circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome."). In cases of alleged psychological coercion, courts "look to the totality of the circumstances" surrounding the statements. *See Haswood*, 350 F.3d at 1027. Courts "often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* "The Government bears the burden of proving that [the suspect's] statements were voluntary and must do so by a preponderance of the evidence." *Id*.

  Here, the Government has met its burden of showing that Nixon's statements to Detective Tews were not the product of coercion. Nixon is an adult with experience in the criminal justice system, *supra* p. 15, and there is no indication that his intellect is wanting such that he was unable to understand the consequences of waiving his *Miranda* rights, of which he had been adequately advised, *supra* pp. 13–15. The length of Nixon's detention between his arrest and interrogation by Detective Tews was not unreasonable. Officers Sanchez and Moreno delivered Defendants to police headquarters roughly forty minutes after the arrest, *see* Def. Ex. E at 20:00–58:30, and Defendants contend that they were left inside the squad cars at headquarters for roughly an hour prior to interrogation, *see* Mot. at 5. The interrogation itself lasted approximately ten minutes. *See* Def. Ex. G at 1:10–10:40.

  Further, the Court finds that the officers did not coerce Nixon by subjecting him to excessive heat in an effort to overcome his will. There is no evidence showing that Nixon complained during the interview about being thirsty, excessively hot, or an inability to answer Tews' questions due to his discomfort. *See id.*; ECF No. 85-1 at 19–29. On the contrary, audio of the interrogation indicates Nixon cogently responded to Tews' questions and maintained his innocence regarding the possession of the firearm. *See* Def. Ex. G.

  Nixon was provided with air conditioning in the police vehicle during transportation from the location of the traffic stop to police headquarters, *see* ECF No. 82 at 35, and at headquarters, the rear passenger window of the vehicle in which Nixon was detained was

rolled down about one-fourth of its length and the front windows were rolled down entirely, *see* Def. Ex. G. at 17:55–18:00. Inside the "sally port," where Defendants were detained prior to interrogation, large fans are used to cool the area. ECF No. 82 at 35–36, 77, 81. The Government has also produced evidence that water was offered to Defendants at police headquarters. *See* ECF No. 62-3, 62-4.

Finally, the Court finds it relevant that the involved officers acted pursuant to San Diego Police Department policy in their handling of Defendants at police headquarters. San Diego Police Department procedure requires that "[w]hen prisoners are left in cars during hot weather, either the front windows shall be rolled completely down or the air conditioning will be left on for ventilation. The back windows shall not be rolled down." ECF No. 80, Ex. 2 at 170. The slight deviation from this policy—partially rolling down the rear windows of the vehicle in which Nixon was held—was to Nixon's benefit.

Defendants cite no caselaw supporting the proposition that discomfort from heat under similar circumstances to those here could amount to coercive conduct by the police. *See* Mot.; Supp. Mot.

For these reasons, the Court **DENIES** Defendants' Motion as to their argument that Defendant Nixon's statements were involuntary.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Suppress Evidence and Statements (ECF No. 49).

**IT IS SO ORDERED.**

Dated: June 1, 2023

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge